FILED IN
COURT OF CRIMINAL APPEALS

December 17, 2015

ABEL ACOSTA, CLERK

PD-0832-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/17/2015 12:39:45 PM
Accepted 12/17/2015 12:49:56 PM
ABEL ACOSTA
CLERK

**NO. PD-0832-15**

---

**IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS**

---

**JAMES ALAN JENKINS**
Appellee

**VS.**

**THE STATE OF TEXAS,**
Appellant

---

ON DISCRETIONARY REVIEW FROM THE
COURT OF APPEALS FOR THE
FOURTEENTH SUPREME JUDICIAL DISTRICT OF TEXAS
AT HOUSTON
CASE NUMBER 14-13-00662-CR

Appeal from the District Court
of Montgomery County, Texas
359th Judicial District
Trial Cause Number 12-03-02579-CR

---

**APPELLEE'S BRIEF IN RESPONSE TO STATE'S BRIEF**

---

**GEORGE McCALL SECREST, JR.**
State Bar No. 17973900
BENNETT & SECREST, PLLC
808 Travis Street, 24th Floor
Houston, Texas 77002
(713) 757-0679; (713) 650-1602 (FAX)
gmsecrest@aol.com

Attorney for Appellee,
**JAMES ALAN JENKINS**

**[APPELLANT REQUESTS ORAL ARGUMENT]**

# NAMES OF ALL PARTIES

JUDGE:                        Honorable John Stevens
                              359th District Court
                              Montgomery County, Texas

PROSECUTORS:                  Jonathan White
                              David Glickler
                              Attorney General of Texas
                              Assistant Attorney Generals
                              P.O. 12548
                              Austin, Texas 78711

DEFENSE ATTORNEY:             Audley Heath
                              609 Colquitt Street
                              Houston, Texas 77006

APPELLATE ATTORNEYS:          Jon R. Meador          (Appellant)
                              Office of the Attorney General
                              Assistant Attorney General
                              P.O. Box 12548
                              Austin, Texas 78711

                              George McCall Secrest, Jr.    (Appellee)
                              Bennett & Secrest, PLLC
                              808 Travis Street, 24th Floor
                              Houston, Texas   77002

# TABLE OF CONTENTS

**PAGE**

NAMES OF ALL PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE PROCEDURAL HISTORY OF THE CASE. . . . . . . . . . 2

GROUNDS FOR REVIEW PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ISSUE NUMBER ONE:  The Court of Appeals erred in failing to
affirm the trial court's ruling  denying Appellee's Request for a
Section 8.03 Mistake of Law instruction.

ISSUE NUMBER TWO:  The Court of Appeals erred in finding that
Appellee was harmed by the trial  Court's failure to provide a Section
8.03 Mistake of Law instruction.

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    Overview of trial testimony and exhibits. . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

GROUND FOR REVIEW NUMBER ONE RESTATED. . . . . . . . . . . . . . . . . . 26

The Court of Appeals erred in failing to affirm the trial court's ruling denying Appellee's Request for a Section 8.03 Mistake of Law instruction.

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

(A)    Reasonable reliance by Jenkins on authoritative sources of law. . . . 26

(1) Opinion of Secretary of State – Election Law Opinion GSC-1.. 27

(2) Opinion of Attorney General – Opinion No. GA-0141. . . . . . . . 30

(3) The *Mills v. Bartlett* Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

(B)    Defense counsel made a specific, timely request for a § 8.03(b)
jury instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

(C)    The affirmative defense of Mistake of Law. . . . . . . . . . . . . . . . . . . . 34

(D)    The doctrine of "confession and avoidance" is inapplicable
to the affirmative defense of "Mistake of Law". . . . . . . . . . . . . . . . 36

(E)    Whether a defendant had a "reasonable" belief or acted
"reasonably" is a fact question for the jury to resolve. . . . . . . . . . . . 46

GROUND FOR REVIEW NUMBER TWO RESTATED. . . . . . . . . . . . . . . . . . 49

The Court of Appeals erred in finding that Appellee was harmed by the trial court's failure to provide a Section 8.03 Mistake of Law instruction.

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

APPENDIX A

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Abdnor v. State,*
     871 S.W.2d 726 (Tex. Crim. App. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Almanza v. State,*
     686 S.W2d. 157 (Tex. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . 49, 52

*Arline v. State,*
     721 S.W.2d 348 (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . . 34, 49

*Arroyo v. State,*
     9 S.W.3d 330 (Tex. App. 1999)
     *vacated*, 32 S.W.3d 868 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . 50

*Austin v. State,*
     541 S.W.2d 162 (Tex. Crim. App. 1976) .. . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Barnette v. State,*
     709 S.W.2d 650, (Tex. Crim. App. 1986).. . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Boykin v. State,*
     818 S.W.2d 782 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Briggs v. State,*
     740 S.W.2d 803 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Commonwealth v. Kratsas,*
     764 A.2d 20 (Penn. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Cornet v. State,*
     359 S.W.3d 217 (Tex. Crim. App. 2012). . . . . . . . . . . . . . . . . . . . . . . . 38-40

*Coury v. Prot*,
 85 F.3d 244 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Crawford v. State*,
 629 S.W.2d 165 (Tex. App.–Waco 1982). . . . . . . . . . . . . . . . . . . . 47

*Davison v. State,*
 405 S.W.3d 682 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . . . . . 52

*DeHam v. State,*
 389 S.W.2d 955 (Tex. Crim. App. 1965). . . . . . . . . . . . . . . . . . . . . 37

*Dyson v. State,*
 672 S.W.2d 460 (Tex. Crim. App. 1984). . . . . . . . . . . . . . . . . . . . . 47

*Francis v. State,*
 36 S.W.3d 121 (Tex. Crim. App. 2000). . . . . . . . . . . . . . . . . . . . . 33

*Giesberg v. State*,
 984 S.W.2d 245 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . 38, 41

*Gonzales v. State*,
 723 S.W.2d 746 (Tex. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . 16

*Granger v. State*,
 3 S.W.3d 36 (Tex. Crim. App. 1999). . . . . . . . . . . . . . . . . . . . . . . 48

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Green v. State,*
 829 S.W.2d 222 (Tex. Crim. App. 1992). . . . . . . . . . . . . . . . . . . . . 36

*Hawkins v. State*,
 656 S.W.2d 70 (Tex. Crim. App. 1983). . . . . . . . . . . . . . . . . . . . . . 36

*Holman v. State*,
730 S.W.2d 881 (Tex. App.–Fort Worth 1987). . . . . . . . . . . . . . . . . . . . . 47

*Jackson v. State*,
646 S.W.2d 225 (Tex. Crim. App. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jenkins v. State*,
468 S.W.3d 656 (Tex. App.–Houston [14th Dist.] 2015). . . . . . . . . . . *passim*

*Juarez v. State*,
308 S.W.3d 398 (Tex. Crim. Ap. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Kimbro v. State,*
249 S.W.2d 919 (Tex. Crim. App 1952).. . . . . . . . . . . . . . . . . . . . . . . . . . 37

*McBeth v. Streib*,
96 S.W.2d 992 (Tex. Civ. App.–San Antonio 1936, no writ). . . . . . . . . . 30

*Meraz v. State*,
785 S.W.2d 146 (Tex. Crim. App. 1990). . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Miller v. State,*
33 S.W.3d. 257 (Tex. Crim. App. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Miller v. State,*
660 S.W.3d. 95 (Tex. Crim. App. 1983).. . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Mills v. Bartlett*,
377 S.W.2d 636 (Tex. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Mills v. Bartlett*,
375 S.W.2d 940 (Tex. Civ. App.–Tyler 1964). . . . . . . . . . . . . . . . . . . . 21, 32

*Ostrosky v. State of Alaska*,
913 F.2d 590 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Reyes v. State,*___S.W.3d___,
   2015 WL 6726711 (Tex. Crim. App. Nov. 4, 2015). . . . . . . . . . . . . . . . . 52

*Roberts v. State*,
   319 S.W.3d 37 (Tex. App.–San Antonio 2010). . . . . . . . . . . . . . . . . . . . . 42

*Sanders v. State*,
   707 S.W.3d 78 (Tex. Crim. App. 1986). . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Shaw v. State*,
   243 S.W.3d 647 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 47

*Speights v. Willis*,
   88 S.W.3d 817 (Tex. App.–Beaumont 2002, no. pet.) . . . . . . . . . . . . . . . 31

*State v. Cooper*,
   420 S.W.3d 829 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 41

*State v. Renteria*,
   977 S.W.2d 606 (Tex. Crim. App. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 50

 *Taylor v. Kentucky*,
   436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978).. . . . . . . . . . . . . . . 34

*Texas Highway Dept. v. Kimble County*,
   239 S.W.2d 831 (Tex. Civ. App.–Austin 1951, writ  ref'd n.r.e.). . . . . . . 29

*Thompson v. State*,
   236 S.W.3d 787 (Tex. Crim. App. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 44

*Tompkins v. State*,
   774 S.W.2d 195 (Tex. Crim. App. 1981) (op. on reh'g). . . . . . . . . . . . . . 47

*Walters v. State,*
   247 S.W.3d. 204 (Tex. Crim. App. 2007).. . . . . . . . . . . . . . . . . . . . . . . . 33

*Williams v. State*,
547 S.W.2d  18 (Tex. Crim. App. 1977)................................ 34

*Willis v. State*,
790 S.W.2d 307 (Tex. Crim. App. 1990). ................. 26, 37, 40-41

**STATUTES**

TEX. CODE CRIM. P. Art. 36.14.................................... 33

TEX. CODE CRIM. P. Art. 36.15.................................... 33

TEX. CODE CRIM. P. Art. 36.19.................................... 49

TEX. ELECTION CODE, § 1.002. .................................... 15

TEX. ELECTION CODE, § 1.005. .................................... 15

TEX. ELECTION CODE, § 1.005(17).................................. 15

TEX. ELECTION CODE, § 1.015. ................. 2, 8, 15, 23, 24, 27, 31

TEX. ELECTION CODE, § 11.001. ................................. 15, 16

TEX. ELECTION CODE, § 31.001(a)................................. 27

TEX. ELECTION CODE, § 31.004(a)................................. 27

TEX. ELECTION CODE, § 64.102. .................................. 8, 13

TEX. ELECTION CODE, § 64.102(a)(1)............................. 1, 24

TEX. PENAL CODE, § 1.07(a)(1)................................... 37

TEX. PENAL CODE, § 1.07(a)(10).................................. 37

TEX. PENAL CODE, § 2.02(a). .................................... 43

TEX. PENAL CODE § 6.04(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

TEX. PENAL CODE § 8.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

TEX. PENAL CODE ANN. § 8.03. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. PENAL CODE ANN. § 8.03(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii, 32

TEX. PENAL CODE, § 8.03(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

## **RULES**

Tex. R. Evid. 201(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## **TREATISES**

8 Tex. Prac., Criminal Forms and Trial Manual § 105.4 (11th ed.) . . . . . . . . . 33, 51

21 Am. Jur. 2d Criminal Law § 138. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42

Tex. Crim. Prac. Proc. § 43:42 (3d ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Texas Criminal Practice Guide § 122.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## **OTHER AUTHORITIES**

Model Penal Code § 2.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Model Penal Code § 2.04(3)(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Op. Tex. Att'y Gen. No. JM-611 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Op. Tex. Att'y Gen. No. JM-231 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Texas Criminal Pattern Jury Charges. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**TO THE
COURT OF CRIMINAL APPEALS OF TEXAS**

**THE STATE OF TEXAS**

**VS.**

**JAMES ALAN JENKINS**

<u>**APPELLEE'S BRIEF IN RESPONSE TO STATE'S BRIEF**</u>

**TO THE HONORABLE JUDGES OF THE TEXAS COURT OF CRIMINAL APPEALS:**

COMES NOW, the appellee, James Alan Jenkins, and respectfully presents his

Brief in Response to the State's Brief, and respectfully shows the Court the following:

<u>**STATEMENT OF THE CASE**</u>

This is an appeal from a conviction for violating § 64.102(a)(1) of the Election

Code.[1]  The defendant, James Alan Jenkins, was charged by grand jury indictment

on March 8, 2012.  (CR – 11).[2]  Trial commenced on June 24, 2013, before the

---

[1]That provision of the Election Code provides it is an offense if a person "votes or attempts to vote in an election in which the person *knows* the person is not eligible to vote."  (Emphasis added).

[2]In pertinent part, the grand jury alleged that Mr. Jenkins "on or about May 8, 2010 ... in the County and State aforesaid, did then and there vote in an election in which the defendant knew he was not eligible to vote, to-wit:  Defendant voted in the May 8, 2010 Woodlands Road Utility District Board of Directors election, when he knew he did not reside in the precinct in which he voted...."

(continued...)

1

Honorable John Stevens, sitting by administrative assignment for the 359th Judicial District Court, and concluded on June 27, 2013, with a verdict of "guilty." (CR – 8-9, 93). The punishment phase began on the same date and concluded on June 28, 2013, with the jury assessing punishment at confinement in the institutional division of the Texas Department of Criminal Justice for a term of three (3) years and a fine in the amount of $10,000.00. (CR – 8). Timely notice of appeal was thereafter given on the same date. (CR – 331).

## STATEMENT OF THE PROCEDURAL HISTORY OF THE CASE

On June 4, 2015, the Court of Appeals reversed the judgment and remanded the case for a new trial.[3] *Jenkins v. State,* 468 S.W.3d 656, 658, 682 (Tex. App.–Houston [14th Dist.] 2015). No motion for rehearing was filed. On September 16, 2015, this Court granted the State's Petition for Discretionary Review. The State's Brief was filed on November 2, 2015. This Court granted the Appellee's

---

[2](...continued)

The majority opinion below held that "the State was required to prove that Jenkins (1) voted in an election (2) knowing he did not reside in a precinct in the territory covered by the RUD election of May 8, 2010." (*Id.* at 672-673.)

[3]The Court of Appeals did not reach Jenkins' second Point of Error:

Section 1.015 of the Election Code is unconstitutionally vague as applied to the defendant herein because the definition of "residence" is fatally ambiguous and encourages arbitrary enforcement of the penal law in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

2

request for an extension of time to file a brief in response and ordered that the same be filed on or before December 17, 2015.

## GROUNDS FOR REVIEW PRESENTED

**ISSUE NUMBER ONE: The Court of Appeals erred in failing to affirm the trial court's ruling denying Appellee's Request for a Section 8.03 Mistake of Law instruction.**

**ISSUE NUMBER TWO: The Court of Appeals erred in finding that Appellee was harmed by the trial Court's failure to provide a Section 8.03 Mistake of Law instruction.**

## STATEMENT OF FACTS

### I.
### Introduction

The present case arises out of an election held on May 8, 2010, for members of the Board of Directors of the Woodlands Road Utility District in Montgomery County, Texas, hereinafter referred to as "RUD." The prosecution averred that the defendant, hereinafter referred to as "Jenkins," (and several other individuals) was not duly eligible to vote in the aforementioned election because "he knew he did not reside in the precinct in which he voted." (CR – 11). To the contrary, Jenkins and several other individuals (some of whom were also indicted) testified that they believed their respective votes on May 8, 2010, in the RUD election were valid and

3

lawful because at the time they had both bodily presence and an intention to create residence for voting purposes within the precinct. (*See* discussion, *infra*).

## II.

## Overview of trial testimony and exhibits

The Woodland's Road Utility District No. 1 — "RUD" — was created to provide for the construction and maintenance of roadways "in and around the Woodlands" in Montgomery County, Texas. (RR 7 – 33). Road projects are funded by property taxes levied on commercial property within the district; the tax revenue that is generated is used to finance the issuance of bonds and the retirement of the same. (RR 7 – 36, 39). The RUD is governed by a Board of Directors which consists of five (5) directors who ostensibly are elected by voters that reside within its boundaries; three directors are elected in even-numbered years and two directors are elected in odd-numbered years. (RR 7 – 37). While there is no requirement that a director reside within the geographical confines of the RUD in order to qualify to serve in that office, in order to vote in the RUD election, each voter must be a resident of the RUD. (RR 7 – 41). At the time of the May 2010 election which forms the

4

basis of the prosecution herein, three of the directorships (a majority of the board) were up for election.[4] (*Id.*)

On March 8, 2010, Bill Berntsen, Richard McDuffee, and Peter Goeddertz, filed sworn applications requesting to be put on the official ballot for the RUD Board of Directors election slated for May 8, 2010. (State's Exh. 2). These three gentlemen lived outside the confines of the RUD according to the permanent resident addresses provided on the aforementioned applications. (*Id*., RR 7 – 40-42). They filed to run against the three, unelected incumbents. (RR 7 – 43). According to official voter tallies, the incumbents received two (2) votes a piece in early voting; Berntsen, McDuffie and Goeddertz received no votes. (State's Exh. 3; RR – 7 – 44). However, on election day — May 8, 2010 — ten (10) votes were cast for each of the challengers by the following voters: Pete Goeddertz, Roberta Cook, Sybil Doyle, Bill Berntsen, Adrian Heath, Robert Allison, Jim A. Jenkins (the defendant herein), Benjamin Allison, Thomas Curry and Richard McDuffee. (State's Exh. 4; RR – 7 – 45). The final vote tally was 10 to 2. All of the ten votes cast on behalf of the challengers reflected that the voters resided at 9333 Six Pines Drive, which is an Extended Stay Marriott Residence Inn located within the RUD. (State's Exh. 4; RR 7 – 46). With

---

[4]The directorships, at least in theory, are filled by the electorate voting in elections; however, no *contested* election had ever taken place in the RUD before the May 8, 2010, election at issue herein. (RR 7 – 39, 112; CR – 327 – 330).

5

respect to Jenkins, Residence Inn records established that he rented a suite on May 7, 2010, and temporarily left on May 9, 2010. (State's Exh. 6; RR 7 – 49). The Residence Inn records also reflect that Jenkins rented suites in the latter part of May 2010, and left on June 14, 2010. (RR 7 — 146).

The State established that on April 5, 2010, Jenkins executed a Texas Voter Registration Application declaring 9333 Six Pines Drive in the Woodlands as his "residence address" and XX Pastoral Pond Circle in the Woodlands as his mailing address. (State's Exh. 7; (RR 7 – 55).[5] The XX Pastoral Pond Circle address was shown by General Warranty Deed to be a piece of real estate purchased by Jenkins and his wife on or about January 17, 1992, and designated as a "homestead" at least as of June 29, 2004. (State's Exh. 9). According to James Stilwell, a lawyer who represented the three incumbents in an election contest suit, he was permitted by court order to enter Jenkins XX Pastoral Pond Circle property to inspect the same and take photographs of the contents of the house. (RR 7 – 80-81; State's Exh. 21). He found items within that "you would normally find in a home that has been lived in ...." (*Id*). Stilwell testified that Mr. Jenkins stated he was trying to sell the house at XX Pastoral Pond Circle in order to downsize and because his children were grown, his

---

[5]The evidence established that each of the other nine voters similarly executed a Texas Registration Application declaring that 9333 Six Pines Drive in the Woodlands was their residence and did so prior to the May 8, 2010 election in which they voted. (State's Exh. 7; RR 7 – 56-61).

6

grandchildren did not live in the Woodlands area and the house was near a flood plain which was a concern; Stilwell confirmed that a "for sale" sign was in the yard upon his inspection. (RR 7 – 92-93, 103-105). On May 24, 2010, Jenkins changed his drivers's license address to 9333 Six Pines Drive within the time period required by state law. (RR 7 – 95). As of the date of the instant trial, the Pastoral Pond Circle property had not been sold, nor had the homestead exemption been changed. (RR 7 – 118-119).

Omitted from the State's Brief is the fact that on cross-examination, Stilwell conceded that the Election Code does *not* place any time constraint or requirement on how long a person has to reside at a location for it to constitute a residence for voting purposes. (RR 7 – 110). With respect to State's Exh. 34, a letter written by Phil Grant, the First Assistant District Attorney of Montgomery County, and addressed to all of the registered voters (including Jenkins) within the RUD jurisdiction as of April 21, 2010, to be discussed in greater depth, *infra*, Stilwell acknowledged that the letter encouraged the recipients to exercise their votes "in a manner consistent with the law," "to vote in a legal manner," and that when he examined Jenkins concerning the letter during the election contest suit, he (Stilwell) stated to Jenkins, "*I understand that's what you believe occurred.*" (RR 7 – 103) (Emphasis added.) Stilwell confirmed that the letter was written for "informational

7

purposes only," referenced authoritative sources for the recipient of the letter to consult regarding legitimacy of "current voter registration," and even encouraged the recipient to seek counsel for legal advice before voting. (RR 7 – 121-124).

First Assistant District Attorney Phil Grant testified that he sent a copy of State's Exh. 34 to the duly registered voters within the RUD jurisdiction after being asked to do so by Stilwell (on behalf of the unelected incumbents). (RR 7 – 128-129). He agreed that within the letter he suggested to the recipients that they read opinions addressing voter residency requirements as explicated by both the Texas Attorney General and the Secretary of State and included the text of § 64.102 of the Election Code which addresses illegal voting; he did not state to the recipients that they could not vote in the RUD election, nor did he include the text of § 1.015 (which sets forth the legal definition of "residence") or make any effort to define or explain the legal terms "eligibility" and "residence." (RR 7 – 130, 134, 140). Although omitted from the State's brief, Grant, as did Stilwell, agreed that the law does *not* impose any temporal requirement before a citizen can vote at a particular location although an individual does have to register at least 30 days before an election (for administrative purposes *only*) — which was done in this case. (RR 7 – 131).

Grant conceded that there is nothing in Texas law which imposes a requirement of "permanent residency" with respect to voting but was of the view that "if you

interpret the statute correctly, you have to have an intent to live in that place. You just can't vote wherever you want to. You got to vote where you intend to reside and live, not just — not just some temporary place where you rent a hotel room." (RR 7 – 132). He admitted that his opinion was based on his legal training and experience and that others either with or without a law degree might differ in their interpretation of the law. (RR 7 – 133). He acknowledged that if the recipient of the letter actually printed out that case law (referenced in the opinions) and studied it and sought legal counsel, and after doing all those things was convinced they had a right to vote in that election, "I suppose they did ... what that letter encourages them to do..." (*Id.*)

He confirmed that each recipient of the letter was encouraged to seek counsel concerning voting residency requirements and also agreed it would have been a good idea for the Secretary of State's office, which was in charge of the election process, to be contacted in an effort to "get an idea of what they mean in that position paper." (RR 7 – 136).[6] Although the definitions of "eligibility" and "residence" were not provided in the letter, Grant was of the view that those terms "certainly seem( ) clear to me" and appear "to be pretty specific." (RR 7 – 139-140). He acknowledged on

---

[6]Which is *exactly* what Adrian Heath did on several occasions, and afterwards, passed the information he had acquired on to Jenkins and the others. *See discussion, infra.*

9

cross-examination, however, that prior to trial he had publicly stated that the Secretary of State could do a better job clarifying the statute and it "*would be helpful if the Secretary of State would put forth some clear guidelines regarding the definition of residency rather than leaving it as vague as they have in prior opinions.* (RR 7 — 135-136). (Emphasis added).

The prosecution called Richard McDuffee,[7] Benjamin Allison, and Peter Goeddertz as witnesses. These gentlemen changed their residences to the 9333 Six Pines Drive address prior to the RUD election, (RR 7 – 181; 8 – 51-52; 8 – 102). Each individual had learned about the RUD and the fact that there had never been an election in the RUD district either from Jenkins or Adrian Heath. (RR 7 – 173-174; 8-9, 16-17). McDuffee and Goeddertz consulted with their lawyer in an effort to determine whether they could legally change their residency and vote in the RUD election. (RR 7 – 207; 8 – 99, 101-102). According to McDuffee, the attorney "left it up in the air" and "basically said he wouldn't call it." (RR 7 – 208). McDuffee believed that the residency question was not a "cut and dry, yes/no legal issue." (RR 7 – 212-213). Although omitted from the state's brief, Goeddertz decided to change his residence after consulting with lawyer Eric Yollick and was of the belief that there

_____

[7]The State erroneously asserts in its brief that "*Appellee* testified that Yollick asked the voters to come up with a reason why they moved to the Residence Inn: 'We had to prove that we were honestly going to live at the Residence Inn.' IX RR 164-165." (State's Brief at 12, 59-60) (Emphasis added.) Actually, that testimony was from McDuffee, *not* Jenkins.

was no time period attached to a voter's residency requirement; at the time, he thought what was necessary was that physical presence and intent had to coincide. (RR 8 – 99, 101-102). He was adamant that he did not knowingly commit an illegal act. (RR 8 – 102-103).

McDuffee had received the Grant letter; Allison had not, but his father had. (RR 7 – 181; 8 – 18). Allison had read the opinion letters of the Secretary of State and Attorney General and discussed the matter with his father who was very politically active. (RR 8 – 151). Allison was resolute that he (and his brother, Robert) had the right to choose their own residence whether it be the Residence Inn or that of their parent's–if they had a physical presence at a location before an election and the intent to return. (RR 8 – 51-52; 54-56). It was his intention that the Residence Inn would be his voting residence in the future; he, too, believed he did not commit perjury or knowingly commit a criminal offense by changing his residence and voting. (RR 8 – 55, 66, 51-52).

Jim Doyle testified that for thirteen years, he had been the election judge and precinct chair for precinct 56 ensuring that those who vote are eligible to do so. (RR 8 – 119). He had read the Secretary of State's opinion as well as the Texas Supreme

11

Court decision of *Mills v. Bartlett* [8] cited therein but was not allowed to express his understanding of residency requirements for voting purposes. (RR 8 – 122-123). In March of 2010, he had learned through a presentation put on by Adrian Heath that the RUD dealt with millions of dollars of taxpayer money but had no accountability. (RR 8 – 123). Doyle thought it was a good idea to run candidates for the Board of Directors for the then upcoming election. (RR 8 – 124). He discussed the law of residency with Jenkins, Adrian Heath and lawyer Yollick. (RR 8 – 126). He ultimately decided not to vote in the RUD election because if he changed his residency from precinct 56 he would no longer be precinct chair and election judge; however, on Doyle's advice, his wife, Sybil, and daughter, Roberta Cook, changed their residences to the Residence Inn and voted in the RUD election. (RR 8 – 127).

Adrian Heath testified that he had lived in Montgomery County for nearly twenty-five years, was "very political," and particularly interested in fiscal issues at the local government level. (RR 8 — 138-139). He learned that the RUD was apparently formed in 1991 with enabling legislation, that its five board members were "hand-picked by the developer, the Woodlands Development Company," then confirmed in an election for directors, and that since that time, there had been three other (unopposed) elections. (RR 8 – 153-154). He spoke to Randall Dillard, Joe

[8] 377 S.W.2d 636 (Tex. 1964).

12

Kulhavy,[9] and an unidentified woman — all employed by the Secretary of State — "and asked about anomalies and unconstitutional issues surrounding the RUD, how that could occur and how that could be remedied." (RR 8 – 154-157). He got the voter registration records of the existing voters within the RUD from Carol Gaultney, the Voter Registrar for Montgomery County at the time. (RR 8 – 158).[10] (This fact, too, is conspicuously omitted from the State's Brief.)

Based on information he received from Kulhavy, Heath decided that he wanted to establish his residence in the RUD so he could vote in the then upcoming election because "that was my right to do so." (RR 8 – 160, 163). (RR 8 – 163). He, too, received the Phil Grant letter and read the Secretary of State and Attorney General opinions, as well as § 64.102 of the Election Code. (RR 8 – 165). The State seeks to minimize Heath's due diligence by simply stating that "Heath began speaking with State and local election officials about the residency requirements for voting" (State's Brief at 5), when, in fact, he spoke to Kulhavy before he received the Grant letter, and again afterwards; in all, he had up to six conversations with him each of which were

_____

[9]Kulhavy was described as the Chief Elections Officer for the State of Texas who is an attorney and specializes in election law. (RR 8 – 159).

[10]He spoke to Gaultney before the RUD election and based on that conversation decided to go ahead and vote in the election. (RR 8 – 177). As reflected by Ms. Gaultney's Certification of Voter Registrar, dated April 19, 2010, twenty-two (22) eligible voters were identified with the RUD. See footnote 12, *infra*.

45 minutes to an hour in length, and went over the opinion of the Secretary of State with him. (RR 8 – 165, 167). It was after his conversations with Kulhavy and consultation with lawyer Adam Muery in March of 2010 that he decided to change his residence to the RUD. (RR 8 – 166-168). As Heath testified, "I was confident that I was within the law." (*Id.*)

Heath not only read the aforementioned opinions of the Secretary of State and the Attorney General but also read the *Mills v. Barlett* decision. (RR 8 – 170). He believed that what was required was "you have to have a combination of intent and bodily presence in a location to establish residence for voting purposes." (RR 8 – 170-171). When he filled out his voter registration form, he believed he had already legally established residency at that time. (RR 8 – 171). He did not knowingly make a fraudulent statement on the voter registration form and did not cast a vote knowing that he had the wrong residence for voting purposes. (RR 8 – 172). He believed he fully complied with Grant's letter: he consulted the resources referenced therein, sought the advice of counsel, and thereafter, exercised his right to vote in a manner consistent with the law. (RR 8 – 174-175). He was of he view that current law does not require a voter to establish permanent residency in order to be able to vote in an election. (RR 9 – 193, 203-204). He had formed the intent for purposes of voting that the 9333 Six Pines Drive address would be used forever; he was not going to

14

vote in future elections at his former address. (*Id.*) *All of the information he had acquired regarding establishing residency to vote he shared with Jenkins.* (RR 8 – 194).

Eric Yollick, an attorney that many of the defendants/witnesses in this case consulted, was called to testify as an expert witness for the defense but was precluded from doing so by the trial court. (RR 8 – 247-254). He verified that Jenkins sought legal counsel from him on the issue of voter eligibility. (RR 9 – 8). Yollick was familiar with the Grant letter and identified Def. Exhs. 1 and 2, the aforementioned election law opinions issued by the Secretary of State and the Attorney General, respectively, which were referenced in the letter and testified that he reviewed the opinions and discussed their contents with Jenkins. (RR 9 – 9-13). In addition to reading relevant case law, he also reviewed §§ 1.002, 11.001 and 1.005[11] of the Election Code which deal, respectively, with qualifications to vote, eligibility to vote, and the definition of "residency." (RR 9 – 61).

Consideration was given to other materials written by government officials including an April 19, 2010, Certification letter with an attachment from Carol Gaultney, the elections administrator and registrar for Montgomery County, who had

---

[11]This appears to be a typographical error in the record. Section 1.015 deals with "residence." Section 1.005(17) defines "residence address."

issued an opinion specifically as to voter eligibility in the RUD. (RR 9 – 10, 14; Def. Exhs. 3 and 4, *see* footnote 12, infra). The legal opinion he gave to Jenkins was based on his review of all of these materials. (RR 9 – 19). He was not permitted, however, to testify in the presence of the jury as to what his opinion was in that regard. (RR 9 – 20).[12]

Outside the presence of the jury, Yollick testified he was of the opinion that Jenkins "had both an intent and bodily presence at the Residence Inn and that was his home. That was his residence ... for purposes of meeting the registration and eligibility requirement of 11.001 of the election code." (RR 8 – 219). He advised Jenkins that there was no durational requirement with respect to establishing a

---

[12]The trial court admitted into evidence Def. Exhs. 1 and 2 but sustained the prosecution's objection to the admissibility of Def. Exh. 3 (Gaultney) Eligibility letter, Def. Exh. 4 (Gaultney) Registration letter, and Def. Exh. 5, a letter written by Yollick to Michael Page, the attorney for the RUD. (RR 9 – 12, 35). Appended to this brief as Appendix "A" is a "true and correct copy as taken from official county records as of 10/29/2013" of Def. Exh. 3, the Certification of Voter Registration and the attachment that listed Jenkins as an eligible voter of the RUD prepared by Ms. Carol Gaultney, the Elections Administrator/Voter Registrar for Montgomery County that Yollick and later Jenkins referred to in their testimony (RR 9 – 20, 72, 96, 104) which was excluded by the trial court (RR 9 – 14, 35). This Court, however, can take judicial notice of this official record on appeal. *See* TEX. R. EVID. 201(f); *Gonzales v. State*, 723 S.W.2d 746, 751-52 (Tex. Crim. App. 1987). *See* Appendix "A".

The Gaultney letter was issued on April 19, 2010, more than two weeks before the May 8, 2010 RUD election, and contained a "*list represent[ing] a best effort to accurately identify all eligible voters within the boundaries of the Woodlands Road Utility District #1* [the RUD]." (Emphasis added.) Significantly, Ms. Gaultney used the words "eligible voters", a phrase which includes the terms 'qualified' and 'registered' in its legal definition. The name "James Alan Jenkins" and his voting residence address at "9333 Six Pines Drive" are included on this eligible voter list.

residence for voting purposes. (RR 8 – 219-220). Based on his knowledge of the law and applying that to the facts surrounding Jenkins's residence at the Residence Inn on the date of the election, he was of the opinion that "he was both qualified and eligible to vote under the election code." (RR 8 – 242-243).

James Jenkins testified in his own behalf. At the time of his testimony, he was residing at XX Pastoral Pond Circle where he had lived for approximately twenty years. (RR 9 – 64). He earned an electrical engineering degree from the University of Houston and a Master's degree in laser physics from Rice University. (RR 9 – 65). He had been married to his wife, Laura, for thirty-five years, and has three children and nine grandchildren with one on the way. (*Id.*) He considered himself to be "extremely analytical and very focused" and very politically active. (RR 9 – 66-67).

In late February or early March of 2010, he received a call from Adrian Heath to discuss the RUD issue which lead to a public meeting that took place in early March of 2010 in the public library located in the RUD which he attended along with Goeddertz, McDuffee, Berntsen, Heath, and Doyle, among others. (RR 9 – 72). At the meeting, Heath gave him a copy of Def. Exh. 1, the opinion letter of the Secretary of State. (RR 9 – 73). Jenkins read the opinion letter and closely studied the *Mills v. Bartlett* decision that was discussed extensively therein. (RR 9 – 81). Although the opinion letter concerned a Prairie View A & M student, he was of the view that

17

it applied to him, as well, based on the last sentence which stated: "[t]hese principles apply equally to college students *as well as other voters*, and no more can be required of them in order for them to register and vote in the State of Texas." (Emphasis added). (RR 9 – 79). He was not trained as a lawyer, but what he took away from the opinion was that "bodily presence alone and intention alone did not determine a residence, but when the two coincide at that moment the residence is fixed and determined. And that there's no specific length of time for the bodily presence to continue", as in *Mills v. Bartlett.* (*Id.*) As he further explained,

> 'Residence' — if we're going to apply that to everybody equally, it meant that somebody had to have two elements to create a residence for voting purposes. One was bodily presence. That's an — that was interesting to me, bodily presence. That just means that I visited there basically. Okay. And I'm not saying that's what people do. I mean — but you have to have bodily presence. You've been there. And then the second part is intention to create that residence. So to me, it meant that you cannot — you could not claim residence in some place you've never been, some place that you were not involved in. You had to have a bodily presence there. That's the one element. And then you had to have an intention to create that residence for voting purposes.[13] And your right is equal to everyone else's. The homeless guy that lives under a bridge; the people that get in an RV and travel the country, you know; the military people; students, we're all treated the same. The important thing is that you decide. It's you. You have the opportunity to create the residence in your own desires.

---

[13]See footnote 28, *infra*.

18

(RR 9 – 82-83). He filled out the change of residency[14] on April 5, 2010,[15] and chose the Residence Inn because it was close to his bank, the library, the community center where people voted, the post office, and his favorite restaurant. (RR 9 – 84-85).[16]

With respect to his business, it was convenient to be in the Residence Inn because it was half the drive to his office as opposed from the Pastoral Pond Circle address. (RR 9 – 89). He believed that he "was fully complying with the law." (RR 9 – 111). He also was actively trying to sell his house on Pastoral Pond Circle because he was semi-retired, approaching 60 years of age at the time, wanted to

---

[14]In reading the opinion of the Secretary of State and deciding what his residence would be, he believed that it applies to all voters:

> it's more talking about a location rather than a specific dwelling or abode or anything like that. Basically, to be a resident of a community or resident of a district, you have to be a community member, you know. I don't know if that makes sense but that's the gist of what I researched out of this paper. And so, you — your particular location is a location that you decide to call for voting purposes your residence.

(RR 9 – 80). *See Mills v. Bartlett,* 377 S.W.2d 636, 639 (Tex. 1964); and discussion, *infra,* at 32.

[15]Jenkins testified that the opinion letter addresses the "30-day registration requirement" and the fact that it was "for administrative reasons only." (RR 9 – 79). He understood the word "only" as meaning "only" — "[i]t doesn't mean for residency purposes. It's only for administrative purposes, meaning that you register so you give the registrar time to find out what precinct you're in so that she or he can properly assign you ... on ... election day. (RR 9 – 79-80). He believed that the 30-day registration requirement was "not a residency requirement at all. ... There is no specific length of time for the bodily presence to continue." (RR 9 – 144-145). In the final analysis, what was required for him to be eligible to vote in the RUD election was to be registered to vote and to reside in the district: "You vote where you can establish residence for voting purposes." (RR 9 – 80, 123).

[16]Jenkins testified that he uses the RUD everyday; he drives through it, walks on the trails, does his banking and shopping, attends Pavilion events, and gets gas for his car and his car serviced there. (RR 9 – 74-75).

downsize, was tired of maintenance issues, and it was time to sell it. (RR 9 – 85). It was difficult to sell, however, due to the fact that it was next to a flood plain and his son and daughter-in-law decided not to buy it. (RR 9 – 88-89). His decision to change his residence to the RUD was formed, in part, by these other developments. (RR 9 – 88). He had planned for the Residence Inn to be his residence for all future elections as long as he was in the county or anywhere close to it; the Residence Inn was also convenient when he came back into town or had business prospects coming into town. (RR 9 – 89-90).

He received a copy of the Grant letter and although it clearly stated that it was being sent "for informational purposes only" he felt the letter had the potential of suppressing the vote. (RR 9 – 94-95, 121). The resources that Grant mentioned in the letter were the very ones he had already reviewed after speaking with Adrian Heath. (*Id*). Although he had no concerns about the legitimacy of his voter registration, he sought legal counsel as the letter suggested. (*Id.*) After reviewing the letter with Yollick, Jenkins' opinion did not change. (RR 9 – 102). In addition, he reviewed in "great detail" and "critically" cases and other statutes cited within the

opinion of the Secretary of State[17] dealing with the definitions of "residence," "eligibility to vote," and "qualified voter."  (RR 9 – 96).[18]

After reading all of the above and consulting with Yollick, he believed that "I was fully within the law doing what I was doing."  (RR 9 – 97, 101).  (The State makes no mention in its brief of the fact that not only did Jenkins read the aforementioned official opinions and the *Mills v. Bartlett* opinions but, in addition, read the cases cited therein; moreover, he relied on the information imparted to him by Adrian Heath based on the latter's extensive conversations concerning residency with Joe Kulhavy, the Chief Elections Officer for the Secretary of State, as well as the legal advice he received from Eric Yollick.)  Jenkins stated that if he had any concern about the legitimacy of his registration, he would have changed it because he did not want to commit a crime: "[m]y intent was to establish residency in the district, in the

---

[17]He gave particular credence to the opinion of the Secretary of State because that office "is given exclusive authority under my state legislature to interpret all election law." (RR 9 – 101).  He believed the Secretary of State's opinion letter dealt with "residency in the context of voter registration" and agreed that "residency" was a term that ultimately presented a fact question which did "not yield broad categorical answers." (RR 9 – 136).  As far as the Attorney General's opinion letter was concerned, Jenkins noted that "they didn't want to interfere with the fundamental right of voting and so they were very careful in their words."  (RR 9 – 102).  He was "left with the impression that every citizen has the right to determine his own residence in the way he wants it to be with the same legal — in the same legal manner and with the same legal effect as any other adult." (*Id.*)

[18]The State has never disputed that Jenkins was a qualified and registered voter.

21

RUD District, for voting purposes which I had every belief that I could do legally."
(RR 9 –102-103).

On May 7, 2010, he registered at the Residence Inn; he knew there was no duration of residency requirement in order to vote based on his understanding of the opinion letter from the Secretary of State. (*Id.*) There was no time requirement before an election that a voter had to be a resident of a district, nor was there any specific time requirement for the bodily presence to continue. (*Id.*) A person would, however, "have to have an intention to stay there. That would have to be your intention to make that your residence for voting purposes for some indefinite future." (*Id.*) He was aware of the fact that in 1991, by state law, the word "permanent" was removed from voter registration cards. (RR 9 – 109). That fact influenced him because he believed it was consistent with the *Mills v. Bartlett* decision which "on purpose had a very vague, very, very vague definition of residency" and only underscored the fact that "we really can't talk about a permanent residence. We've got to talk about location...." (RR 9 – 110).[19]

---

[19]As he later explained,

> [t]he definition of residence is vague and intentionally so. ... It's clearly vague. And that's done intentionally so that the individual can determine where he wants to vote. He gets one vote. He gets to decide. Not the state. Not my next-door neighbor, you know. Not some government entity in Washington. I do. It's one of your fundamental rights.

(continued...)

22

Although he agreed that the Election Code required that a voter must be a resident of the territory where an election for an office for which the voter desired to vote was being held, he believed that requirement could be fulfilled if residency was established on the day of election. (RR 9 – 113). He acknowledged that "residency" is determined in accordance with "the common-law rules as enunciated by the courts of this state," except as otherwise provided by the Election Code, and believed that his understanding of the legal concept of "residency" was based on that. (RR 9 – 115-116).[20] (It is also consistent with a fair reading of Justice Dunagan's dissenting

_____

[19](...continued)
(RR 9 – 126-127).

[20]He agreed that going to another place "for temporary purposes only" did not result in the loss of residency but was of the view that "habitation" had a meaning which encompassed more than simply where a person spent the night or dwelling place; as he testified, it is "where I go; where I am; what district I'm in," "an area ... [i]t's a locality." (RR 9 – 116, 121, 124, 127-128). As Jenkins explained, the "fixed place of habitation" as applied to the "RV-ers" who travel the country is the fixed post office box and not the moving RV; "Habitation" (which has no legal definition) is not a dwelling but rather a locality. (*Id*.). He read § 1.015 of the Election Code which defines "residence" as meaning the following:

> If you look at the definition of residence, you'll notice that there are words like 'home,' but there's — there are more words like 'place.' There's five – five times the word 'place' is in that definition. That's a locality. That's an area. That's part of where you go, okay? And in — clearly in my case, a place is the Road Utility District, that whole district, because really that's for voting purposes that's what we're talking about. Where do you spend your time. Where is your — what are your habits? And that's why they wrote it they (sic) way. Now, I think you can get very confused if you think habitation meaning (sic) a dwelling. Nowhere is dwelling mentioned. Nowhere is house mentioned. Nowhere is abode mentioned.

(RR 9 – 129-30). He was of the opinion that the term "residence" or "residency" has different
(continued...)

23

opinion and its criticism of the majority opinion in *Mills v. Bartlett, supra,* at 32.) At no time during the process did he knowingly put down an improper address for his residence. (RR 9 – 111). *Based on his review of the aforementioned authorities and information provided him*, he believed he voted lawfully in the May 8, 2010 RUD election. (RR 9 – 152).

## SUMMARY OF THE ARGUMENT

The trial court committed reversible error by refusing to instruct the jury as to the affirmative defense of Mistake of Law which was both raised by the evidence and specifically requested by defense counsel. The defendant was indicted for allegedly voting illegally in contravention of §64.102(a)(1) of the Election Code. At issue is whether or not he voted in an election *knowing* he did not reside in the precinct in which the vote was cast. The defendant steadfastly contended that based on his review of established case law and opinions issued by the Texas Attorney General and Secretary of State, as well as reliance on the advice of counsel and a Certification letter from the Elections Administrator/Voter Registrar for Montgomery County, he

---

[20](...continued)
meanings depending upon the context in which it is used, and based on durational residency requirements, such as residency for purposes of voting, obtaining a driver's license, or becoming a candidate for office. (RR 9 – 140). (*Jenkins, supra,* at, 678, n. 12.)

Tellingly, the prosecution, in its brief below, stated: "[t]he State agrees that Section 1.015 applies equally to everyone, student-or non-student alike, that one's subjective intent to reside is relevant, and that there are no durational requirements, and that stays in hotels for long or short periods of time may be evidence of residency." (State's Brief at 55-56).

24

reasonably believed he was a resident of the precinct in which he voted. Notwithstanding the fact that the aforementioned authorities were offered and admitted into evidence[21] and testimony was adduced as to the defendant's reliance thereon, the trial court denied defense counsel's request for a Section 8.03 Mistake of Law jury instruction holding that in light of the fact the defendant did not admit that he had *committed the offense alleged in the indictment*, he was not entitled to the same.

The majority opinion of the Court of Appeals reversed the conviction and remanded the case for a new trial holding that the defendant was harmed by the trial court's failure to affirmatively instruct the jury as to Mistake of Law. The majority held that the "confession and avoidance" doctrine while applicable to some statutory defenses is not applicable to those which, by their very terms, negate the culpable mental state that the defendant must have in order to be guilty of the offense charged and, on the present record, the defendant "presented some evidence that he reasonably relied on the election law authorities when he voted....and the reasonableness of [the defendant's] beliefs and conduct was an issue for the jury to decide."

---

[21]The "Gaultney" Certification letter was not admitted into evidence by the trial court but testimony was adduced relative to Jenkins' reliance thereon. *See* discussion, *infra.*

Both the State and the dissenting opinion seek a construction of section 8.03 which, not only is insupportable based on the very text of the statute itself, but if adopted, would amount to a "re-write" of a legislative enactment–in this case–an affirmative defense to a criminal offense that only the Texas legislature has the exclusive "power to establish and define..." *Willis v. State,* 790 S.W.2d 307, 314 (Tex. Crim. App. 1990).

## GROUND FOR REVIEW NUMBER ONE RESTATED

**The Court of Appeals erred in failing to affirm the trial court's ruling   denying Appellee's Request for a Section 8.03 Mistake of Law instruction.**

## ARGUMENT AND AUTHORITIES

**(A)    Reasonable reliance by Jenkins on authoritative sources of law**

As the record indisputably reflects, Jenkins made the decision to change his residency to the Residence Inn only after careful study, reflection, and reliance on advice of legal counsel, as well as information obtained from the Montgomery County Voter Registrar.  Even before he received the April 21, 2010 letter from First Assistant District Attorney Phil Grant which referenced the previously mentioned opinions of the Texas Secretary of State and Attorney General, Jenkins was already

26

aware of these legal authorities *and the cases cited therein and had closely reviewed them.* (RR 9 – 94-95, 121).[22] The evidence is indisputable in this regard.

**(1) Opinion of Secretary of State — Election Law Opinion GSC–1**

Def. Exh. 1 was admitted into evidence during the testimony of Jenkins. (RR 9 – 34). This document constituted a "formal election law advisory opinion" addressing the opinion of the chief election officer for the State of Texas[23] "on matters relating to residency in Texas." (*Id.* at 1). Section 1.015 sets forth the legal definition of "residence":

(a) In this code, 'residence' means domicile, that is, one's home and fixed place of habitation to which one intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose the person's residence by leaving the person's home to go to another place for temporary purposes only.

---

[22]The majority opinion noted that "[t]he State does not contend that these authorities are out of date, overruled, or contain incorrect statements of the law of residency applicable to voting." (*Jenkins, supra,* at 679.)

[23]"The secretary of state is the chief election officer of the state." TEX. ELEC. Code, § 31.001(a). Section 31.004(a) of the Election Code provides: "The secretary of state shall assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code."

(d)    A person does not acquire a residence in a place to which the person has come for temporary purposes only and without the intention of making that place the person's home.

(e)    A person who is an inmate in a penal institution or who is an involuntary inmate in a hospital or eleemosynary institution does not, while an inmate, acquire residence at the place where the institution is located.

As Secretary of State Connor advised, "[t]he statutory definition of residence adopts Texas common law, reinforcing the notion that residence involves a mixed question of law and fact." (*Id.* at 4). The very nature of the question of residence is "fact-intensive;" no one "factor is dispositive with respect to the question of intent for residence purposes." (*Id.*)

The leading Texas case on residency — *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964) — was analyzed at length in the advisory opinion. As the Supreme Court held,

> [t]he meaning that must be given to it [residence] depends upon the circumstances surrounding the person involved and largely depends upon the *present* intention of the individual. Volition, intention and action are all elements to be considered in determining where a person resides and such elements are equally pertinent in denoting the permanent residence or domicile.
>
> \*   \*   \*
>
> Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined. *There is no specific length of time for the bodily presence to continue.* (Emphasis added).

(Advisory Opinion at 5).  In the final analysis, as Connor concluded, "[t]he majority of Texas courts have consistently ruled that residency is a combination of intention and fact, and that *the voter's intention must be viewed to make a final determination of residency.*"  (*Id.*)  (Emphasis added).  The concept of "residence is a fact question that does not yield broad categorical answers."  (*Id.*); citing Op. Tex. Att'y Gen. No. JM-611 (1986) and Op. Tex. Att'y Gen. No. JM-231 (1984).  There exists a "high standard of proof required to contravert (sic) a voter's stated or written intent" as to his place of residency.  (*Id.*)  Moreover, "the presumption is in favor of the voter's own assessment of the facts and his or her intent."  (*Id.* at 7).

Evidence of an intention to establish domicile "may include, but is not limited to, such factors as where a person 'exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family.' "  (*Id.* at 6, quoting *Coury v. Prot*, 85 F.3d 244, 251 (5th Cir. 1996).[24]  And, of particular relevance herein, "Texas law does not require a statement of durational future residence;" that is to say, no voter is required to assert

---

[24]It is clear that "residence" and "domicile" are not necessarily coterminous with the concept of the physical location where a person "maintains a home for his family."  And, of course, a person may have more than one residence at any given time.  *Texas Highway Dept. v. Kimble County*, 239 S.W.2d 831, 832 (Tex. Civ. App.–Austin 1951, writ  ref'd n.r.e.)

any future intention of residing in a particular precinct when registering to vote. (*Id.* at 8).

### (2)    Opinion of Attorney General — Opinion No. GA-0141

Def. Exh. 2, styled "Residency requirements for voting in an election in Texas. (RQ-0157-GA)", was also admitted into evidence. (RR 9 – 34). As the opinion of the Texas Attorney General denotes, in principle reliance on "the leading Texas Supreme Court case of *Mills v. Bartlett*," *supra*,

> [u]nder current law, the determination regarding 'residence' thus involves both physical presence and current intention of the applicant; if a student, *like any other applicant*, satisfies the requirements of section 1.015, that student is a 'resident' of the county in which he seeks to register. *The intention of the voter registration applicant is crucial to a proper determination of residence, and every person is strongly presumed to have 'the right and privilege of fixing his residence according to his own desires.' McBeth v. Streib,* 96 S.W.2d 992, 995 (Tex. Civ. App.–San Antonio 1936, no writ).[25]

(*Id.* at 5). (Emphasis added). Tellingly, for example, the "mere fact that an applicant claims a post office box as an address or that many applicants claim the same post office box as an address is not dispositive regarding the determination of residence.

---

[25]At trial, the state argued to the jury "when it comes down to it, the law in Texas is *vote where you live*"; "you don't have to pick up a code or a statute or read a case. You don't have to read any Secretary of State opinions to know where you vote. *You vote where you live.*" (RR – 7-17; 9 – 205). (Emphasis added). And yet, that proposition conflicts with the Attorney General's own legal opinion–GA–0141–and with *McBeth v. Streib, supra,* which held that a student who is living in a dormitory room and is present for purposes of voter registration but who intends that his residence to remain the same as his parents can permissibly register to vote in the county of his parents' residency.

Indeed, depending upon the facts in each case, it might not even be relevant." (Id. at 5), citing *Speights v. Willis*, 88 S.W.3d 817 (Tex. App.–Beaumont 2002, no. pet.) The same is true with respect to hotels or motels that are "typically places of short-term accommodation...." (Op. Tex. Att'y Gen. No. JC-0520 at 2). While such an address "might constitute some evidence that there is no intent to remain, a conclusive presumption that there is no bona fide domicile based solely on the nature of the address provided is impermissible." (*Id.*)[26]

### (3)    The *Mills v. Bartlett* Opinions

In *Mills v. Bartlett*, the Supreme Court recognized not only is the term "residence" an elastic concept but it is also "*extremely difficult to define.*" (377 S.W.2d at 637). (Emphasis added).[27] Even the dissenting opinion of Justice Greenhill

---

[26]The majority opinion herein determined with respect to both the Secretary of State and Attorney General opinions that "it is undisputed that these documents constitute written interpretations of the law for purposes of section 8.03(b)(2). (*Id.* at 673).

[27]The Court of Appeals did not address, much less reach, Jenkins' *separate* point of error raising an "unconstitutionally vague as applied" challenge to Section 1.015. As is amply demonstrated by the present record, a voter acts at his peril in choosing his residence for voting purposes notwithstanding the fact that he has dutifully read opinion letters issued by the Secretary of State and the Attorney General (and the case law cited therein), and thereafter relies in good faith on the advice of counsel. The record herein is replete with evidence that the definition of "residence" is vague, far too elastic, ambiguous, and difficult to understand and apply.

It is one thing to subject Texas voters to such a vague definition of "residence" in order for them to attempt to determine where they can legally exercise their constitutionally protected franchise to vote, it is quite another to ultimately deprive a citizen of his liberty despite the fact that he acted in good faith reliance on the very authorities that ostensibly set forth the standard for him

(continued...)

31

acknowledged that "[i]t is understandable that reasonable minds can and often will differ as to the minimum acts and conduct necessary to meet the legal requirements of becoming a resident or of becoming a member of the community...." (*Id.* at 639). In the lower court opinion, 375 S.W.2d 940, the Court, too, acknowledged that "[t]he term 'residence' is an elastic one, and difficult of precise definition." (*Id.* at 943). As the testimony of Jenkins established, he read and studied all of the *Mills v. Bartlett* opinions and his viewpoint was informed by the reasoning expressed therein, including the reasoning of the dissenting opinion filed by Justice Dunagan:

> [t]he majority opinion holds that mere presence in a locality coupled with an intention to return at some indefinite time in the future to take up a place of abode for the first time, and that based on contingencies, is sufficient to establish a residence. With this I cannot agree.

(*Id.* at 950-951)[28] (RR 9 – 93).

**(B)    Defense counsel made a specific, timely request for a § 8.03(b) jury instruction**

---

[27](...continued)
to apply. And that is exactly what happened in the case at bar.

An "inability to define precisely the scope of [the] prohibition" establishes that a statute "is unconstitutionally vague." *Briggs v. State*, 740 S.W.2d 803, 805 (Tex. Crim. App. 1987). Not only may vague laws "trap the innocent by not providing fair warning," they may lead to "arbitrary and discriminatory enforcement." *Grayned v. City of Rockford*, 408 U.S. 104 (1972). The "void for vagueness" argument awaits adjudication.

[28]Jenkins made a reference in his testimony to Justice Dunagan's analysis of the majority's opinion. (RR 9 – 141).

32

As the record reflects, defense counsel submitted a specially requested jury instruction, in writing, apprising the district court of the necessity of charging the jury as to the affirmative defense of "mistake of law"; in addition, defense counsel orally made the same request. (RR 9 – 167-170; CR – 318-322).[29] *See* TEX. CODE CRIM. P. art. 36.15. The trial court denied the requests stating:

---

[29] In his written proposed jury instruction, defense counsel cited to the Texas Criminal Pattern Jury Charges of the State Bar of Texas (§ B12.3, pp. 157-160). Justice Busby asserted in his dissenting opinion that "appellant contends **(on appeal)** he was entitled to jury instructions allowing him to prove by a preponderance of the evidence, that due to a mistake of law, he reasonably believed he resided in the precinct in which he voted. But those are not the instructions appellant requested"; "[c]ritically, appellant's own requested instructions would have submitted the defense as one of confession and avoidance", and "*[b]ecause appellant's requested defensive instructions do not negate an element of the charged offense, but rather excuse what would otherwise constitute criminal conduct, they are subject to the confession and avoidance doctrine.*" *Jenkins, sup*ra, at 682, 688) (Emphasis added). *See also* State's Brief at 27.

As will be explained, *infra,* it is *not* conceded on appeal that the above referenced authority accurately sets forth in its entirety the law applicable to a section 8.03 mistake of law jury instruction. The requested jury instruction was sufficient, however, to bring the matter to the trial court's attention who then was duty bound to provide the jury with an accurate statement of the law. This Court has held that a requested jury instruction need not be correct; it can even misstate the law, and still preserve error: "It must only be sufficient to call the trial court's attention to the omission in the court's charge." *See Francis v. State,* 36 S.W.3d 121, 123 (Tex. Crim. App. 2000). And, once brought to the trial court's attention the trial court is strictly required to provide the jury with "a written jury charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. Art. 36.14. "This law requires the trial judge to instruct the jury on statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence." *Walters v. State,* 247 S.W.3d 204, 208 (Tex. Crim. App. 2007). *See also Austin v. State,* 541 S.W.2d 162, 166 (Tex. Crim. App. 1976) (holding that the requested mistake of law instruction erroneously misplaced the burden of proof; it was, however, sufficient to call the court's attention to the necessity of providing the jury "a correct instruction." It is submitted that a more accurate jury instruction is that proposed in 8 Tex. Prac., Criminal Forms and Trial Manual § 105.4 (11th ed.) by former Presiding Judge Michael J. McCormick, et al.

Number one, as far as Section 8.03 is concerned, the defendant has flatly challenged throughout this trial that he committed the conduct charged. He has stood by his belief and his contention that he was eligible to vote. And that is one of the elements and that is being challenged. *It is not an element that he is admitting to. And for that reason, the mistake of law defense is not going to be allowed.*

(RR 9 – 169-170). (Emphasis added). The trial court was of the opinion that "the Defense has the evidence in the record and it can fairly argue that since they (Defense Exhs. 1 and 2) are part of the evidence."[30]

## (C) The affirmative defense of Mistake of Law

Section 8.03 of the Penal Code provides:

(a) It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken affect.

(b) It is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon:

   (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged

---

[30]Of course, "jury argument is not a substitute for a proper jury charge." *Arline v. State*, 721 S.W.2d 348, 353, n.8 (Tex. Crim. App. 1986). And, as the Supreme Court has held, "arguments of counsel cannot substitute for instructions by the court." *Taylor v. Kentucky*, 436 U.S. 478, 488-489, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978). In *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977), this Court cogently observed, that

... To allow the jury to receive an application of the law to the facts only from the partisan advocates without a neutral and unbiased instruction on the matter in the charge is to risk the degeneration of trial by jury to a debating contest, where the persuasiveness of competing applications of the law to the facts determines guilt or innocence....

34

> by law with responsibility for interpreting the law in question; or
>
> (2)     a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with the responsibility for interpreting the law in question.
>
> (c)     Although an actor's mistake of law may constitute a defense to the offense charged, he may nevertheless be convicted of a lesser included offense of which he would be guilty if the law were as he believed.

Professors Dix and Schmolesky have observed "[a]lthough the caption of the statutory defense is 'mistake of law,' a more accurate statement would indicate that a limited exception is recognized for *reasonable reliance upon an official written statement of the law.*" 43 Tex. Prac., Criminal Practice and Procedure § 43:42 (3d ed.) at 1. (Emphasis added). The defense "may be valid where the defendant shows that he or she acted in the belief *that the charged conduct did not violate the law,* and that the belief arose from reasonable reliance on an official statement of the law by an administrative agency or an interpretation of the law found in a court opinion." 21 Am. Jur. 2d Criminal Law § 138, at 1. (Emphasis added.) As the majority opinion below held,

> to be entitled to the statutory defense of mistake of law, a defendant must present some evidence that (1) he reasonably believed his conduct did not constitute a crime; and that (2) he reasonably relied upon either

35

an official statement of the law or a written interpretation of the law of the type specified in the statute.

(*Id.* at 673, citing *Green v. State,* 829 S.W.2d 222, 223 (Tex. Crim. App. 1992).

By definition, the defense "requires reliance on a narrow class of official statements or interpretations of the law." *Hawkins v. State,* 656 S.W.2d 70, 73 (Tex. Crim. App. 1983). Moreover, "[s]ection 8.03 was not created to allow a criminal defendant to rely upon 'old interpretative opinions, opinions that conflict with others, or on overruled opinions.' " *Green v. State*, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992) (citations omitted).

**(D) The doctrine of "confession and avoidance" is inapplicable to the affirmative defense of "Mistake of Law"**

The prosecution's contention on appeal which echos the trial court's ruling that Jenkins in his testimony before the jury had to "admit" to the commission of a crime — in this case, voting in an election *knowing* he was not eligible to vote — before he would otherwise be entitled to the submission of a mistake of law jury instruction pursuant to Tex. Penal Code § 8.03, is simply incorrect, not supported by relevant case law, indefensible as a matter of statutory construction, and was rejected by the majority opinion below. (*Id.* at 673-676.) Tellingly, the State cites no case which holds that such an admission on the part of the accused is a necessary condition precedent to receiving a "mistake of law" instruction. Although the prosecution relies

36

on *Meraz v. State,* 785 S.W.2d 146 (Tex. Crim. App. 1990)[31] as ostensible support for its "confession and avoidance" argument (State's Brief at 27-29 and footnote 8), in the later decision of *Willis v. State,* 790 S.W.2d 307 (Tex. Crim. App. 1990), this Court acknowledged that its prior holdings and, specifically, the premise of *Sanders v. State,* 707 S.W.2d 78, 81 (Tex. Crim. App. 1986), that "all defenses require the defendant to admit commission of the offense — is not correct." (*Id.* at 314).[32]

In analyzing *Sanders,* the *Willis* Court reasoned that a more accurate statement of the law is that in order to be entitled to an affirmative submission of a defensive

---

[31]*Meraz* did not deal with application of the "confession and avoidance" doctrine but, rather, with the question of "whether an adverse jury finding (namely, that the defendant was "competent" to stand trial) was reviewable on appeal as against the great weight and preponderance of the evidence." In *dictum,* Judge Duncan observed that "the practical, if not technical" effect is "that the defendant would have to at least by implication concede the commission of the **act** in order to avail himself of the affirmative defense." (*Id.* at 153) (Emphasis added). Conceding commission of the "***act***" is far different from conceding commission of the "***conduct***." The former "means a bodily movement, whether voluntary or involuntary, and includes speech" (the actus reas); the latter, "means an act or omission *and* its accompanying mental state" (the mens rea). *See and compare* Texas Penal Code, § 1.07(a)(1) and (10); *see also Jenkins v. State, supra,* at 674-675. As will be explained, *infra,* this does *not* translate into the requirement that to be entitled to a mistake of law defense Jenkins had to admit he voted in an election *knowing* that he was not eligible to vote.

[32]*Kimbro v. State,* 249 S.W.2d 919 (Tex. Crim. App 1952); *DeHam v. State,* 389 S.W.2d 955 (Tex. Crim. App. 1965); *Miller v. State,* 660 S.W.2d. 95 (Tex. Crim. App 1983); and *Barnette v. State,* 709 S.W.2d 650, (Tex. Crim. App. 1986), all cited by the State as authority for its position that the defendant was required to admit to the conduct in order to be entitled to the mistake of law jury instruction (State's Brief at 27-28), not only *predate Willis,* but *Barnette v. State,* specifically cited ***Sanders v. State, supra,*** for the **now discredited proposition** that "[a] defendant who relies on a justification or defense such as one of those enumerated in chapters 8 and 9 of the Penal Code does not deny any element of the State's case. He admits to having committed the *culpable* conduct charged, but asserts he should be found not guilty because his action was somehow justified or excusable." (*Id.* at 652). (Emphasis added.)

jury instruction the accused must not deny *all participation* in the offense; however, he does not have to admit to engaging in the conduct in question *with the culpable mental state* alleged in the indictment. (*Id.* at 314). There obviously are circumstances where "the defendant will be entitled to defensive instructions although he has not admitted the crime." (*Id.*) This Court has re-affirmed that the scope of the proclamations in *Sanders* that "defenses require the accused to admit that he or she committed the alleged offense" and "where a defendant denied all participation in an offense, he or she was not entitled to a defensive instruction because they were only negating the allegation they committed the offense" are too broad and constitute inaccurate statements of law. *Giesberg v. State,* 984 S.W.2d 245, 249-250 (Tex. Crim. App. 1998).[33]

As this Court previously has held, the "confession and avoidance" doctrine is inapplicable where "the defensive issue, by its term, negates the culpable mental state." *Juarez v. State,* 308 S.W.3d 398, 401-402 (Tex. Crim. Ap. 2010). This was re-affirmed in *Cornet v. State,* 359 S.W.3d 217, 225 (Tex. Crim. App. 2012): "[w]e

---

[33]The State cites the Texas Criminal Practice Guide § 122.01 for the proposition that "affirmative defenses" require the defendant to admit commission of the act but seek to excuse or justify commission of the act." (State's Brief at 33, n. 11.) Actually, that is *not* what the practice guide provides. As to "affirmative defenses"–Defense to criminal responsibility of a corporation or association, Insanity, Mistake of law, and Duress–the commentary remarks that "the defendant *usually* admits commission of the acts constituting the crime but is entitled to an acquittal because of circumstances that suspend criminal liability for the act", citing, the *dictum* in *Meraz v. State.*

clarified, in *Juarez,* that the defensive issues the (confession and avoidance) doctrine *does not apply to those that ''by* [*there*] *terms, negate*[ ] *the culpable mental state' required for the commission of the offense.*" (Emphasis added).[34]

In the case at bar, Jenkins steadfastly maintained that he did not vote in the election knowing he did not reside in a precinct in the territory covered by the RUD election; quite to the contrary, he "reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance on" both "a written interpretation of the law contained in an opinion of a court of record (the Supreme Court of Texas and the Texas Court of Civil Appeals) or made by a public official charged by law with responsibility for interpreting the law in question" (the legal opinions issued by the Secretary of State and the Attorney General and a Certification of Voter Registrar letter identifying him as an eligible voter) which entitled him to an affirmative submission of a mistake of law jury instruction. (Tex. Penal Code, Section 8.03(b)(2)). Nothing more was required of him.

The prosecution contends that this Court in *Cornet* "clarified" the confession and avoidance doctrine by holding it was applicable to the medical-care defense because that defense "does not negate any element of the offense, including culpable

---

[34]The Court observed that mistake of fact and "good faith purchase defense" are examples of the same. (*Id.* at fn.17).

mental state; it only excuses what would otherwise constitute criminal conduct."
(State's Brief at 41); *Cornet v. State, supra,* at 224-225. But of paramount
importance is the fact that the medical-care defense, like the "medical-care exception
to the offense of causing injury to a child," the so-called "Good Samaritan defense,"
*are both considered "**justification**" type of defenses*–a fact that has repeatedly been
brought to the State's attention in the proceedings below but remains unaddressed.
Mistake of law, however, is *not* a justification defense. It is found in Chapter *8* of the
Penal Code which sets out "General Defenses to Criminal Responsibility," and *not*
in Chapter *9* which catalogue "Justification [Defenses] Excluding Criminal
Responsibility." *See Willis v. State, supra,* at 314.

Contrary to the prosecution's position that the mistake of law defense "does not
negate any element of the offense", it does just that: "*[t]he purpose of a mistake-of-
law defense is to negate the mental state that the defendant must have to be guilty of
the charged crime.*" *Ostrosky v. Alaska,* 913 F.2d 590, 595 (9th Cir. 1990) (Emphasis
added). As the court reasoned, *"[w]ithout such a mental state, the defendant cannot
be guilty. A necessary element of the crime is missing.*" (*Id.*) (Emphasis added.) *See,
e.g.,* Model Penal Code § 2.04 explanatory note (1985); and *Jenkins, supra,* at 676.[35]

---

[35]The prosecution posits that "any defense premised on mistake of law negating the culpable
mental state was 'intertwined in the challenge to the element that the State has to prove,' thus,
(continued...)

In the present case, the mistake of law defense negated the culpable mental state that Jenkins voted in the election in question allegedly "*knowing*" that he was not a resident of the precinct in which he registered. There is simply nothing in the text[36] of Section 8.03 of the Penal Code which requires a defendant to admit that he

---

[35](...continued)
included in the charge" and that "it was not error to deny the requested instruction because the jury charge adequately covered Apellee's mistake of law negating an element of the offense." (State's Brief at 28-29). This rubric–that a defendant is not entitled to a defensive instruction with respect to evidence that does nothing more than negate an element of the offense–is applicable *only* where the defendant either denies commission of the offense but then seeks to interpose a confession and avoidance defense or advances reliance on a defense which is *not* codified, such as, for example, "alibi." As explained in *Giesberg v. State, supra,*

> [b]ecause the authority to establish what constitutes a defense rests solely with the Legislature, this Court concludes *a defense which is not recognized by the Legislature as either a defense or an affirmative defense does not warrant a separate instruction.* (*Id.*) (Emphasis added.)

Application of this rule, however, is *not* warranted where the defendant relies on a *codified,* non-confession and avoidance defense; otherwise the rule would have the practical and undeniable effect of striking the codified defense "from the Penal Code." *See Jackson v. State,* 646 S.W.2d 225, 227 (Tex. Crim. App. 1983).

[36]"[T]he power to create and define offenses rests within the sound discretion of the legislative branch of government.... This necessarily includes the power to establish and define the defenses to criminal offenses." *Willis v. State, supra,* at 314. This Court has consistently held with regard to interpreting statutes that "we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment. This is because the law is the only thing that is actually enacted through compromise and debate, and because it is the only definitive evidence of what the legislators had in mind at the time of the enactment. Further, under our constitution, the judiciary is supposed to faithfully follow and enforce the adopted text." *State v. Cooper,*420 S.W.3d 829, 831 (Tex. Crim. App. 2013); and *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim. App. 1991). "[I]t is not for the judiciary to add or subtract from the statute." *Miller v. State,* 33 S.W.3d. 257. 260 (Tex. Crim. App. 2000). The majority opinion herein concluded with respect to § 8.03 that "the legislature's intent is unambiguous" and found it "unnecessary to resort to any extra-textual authorities" in interpreting the same. *Jenkins, supra,* at 675, n. 11.

committed a crime before reliance on mistake of law can be interposed.  All that is necessary is that the defendant on trial demonstrate he acted "in the belief that the charged conduct did not violate the law, and that the belief arose from reasonable reliance on an official statement of the law by an administrative agency or an interpretation found in a court opinion."  Tex. Penal Code Section 8.03; and 21 Am. Jur. 2d Criminal Law § 138, at 1.

As such, the accused does not have to admit to the commission of a criminal offense, concede that he was misinformed, acknowledge that his reliance on the law was in error, or even establish that the law he contends he relied on was subsequently determined to be invalid or erroneous.[37]  And, this is precisely what the majority held below: "the affirmative defense of mistake of law is not subject to the confession and avoidance doctrine. ... We therefore hold that Jenkins was not required to admit to the commission of a criminal offense or concede that he erroneously relied on the law to

---

[37]*See Roberts v. State,* 319 S.W.3d 37, 51 (Tex. App.–San Antonio 2010) wherein the defendant received a mistake of law jury instruction despite the fact that she testified she believed her conduct was legitimate and that she had acted in reliance on the Texas Rules of Civil Procedure. In contrast, while a defendant in order to be entitled to a mistake of *fact* defense with respect to the statutorily imposed culpable mental state does not have to admit, for example, that at the time he received  property, he "knew" it was stolen, the defense is predicated on the principle that the defendant "through *mistake* formed a reasonable belief about a matter of fact if his *mistaken* belief negated the kind of culpability required for the commission of the offense." (Emphasis added). The defense, by its very terms, at least suggests that at trial the defendant would have to acknowledge or concede that the property he received, in fact, *was* stolen but can still maintain the lack of knowledge of that fact, at least at the time he took possession of it, due to a reasonable belief which was formed due to a mistake. *Texas' mistake of law defense imposes no similar requirement.*

42

be entitled to a jury instruction on mistake of law." (*Id.* at 676.) Despite the State's proclamation that "[s]ection 8.03 Mistake of Law applies, then, when one argues that some governmental authority *mislead him to committing a crime*" (State's Brief at 51), there simply is nothing in the literal text of Section 8.03 which supports such a construction of the statute.

The State asserts that "by labeling Section 8.03 Mistake of Law an affirmative defense, the Texas Legislature intended to establish not only the burdens of proof *but also to establish pleading requirements necessary to invoke the defense, which would include confession and avoidance.*" (State's Brief at 35) (Emphasis added.) It cites no authority, however, in support of this proposition. The dissenting opinion, too, maintains that section 8.03 "is a defense of confession and avoidance under Texas law" but cites no cases which so hold. (*Jenkins, supra,* at 684.) It even reasons that "Texas–like some other states–has created "*a statutory exception that allows mistake of law to serve as a defense....*" (*Id.*) (Emphasis added.) Of course, section 8.03 is *not* a statutory exception and has not been so denominated by the Texas Legislature. *See* Tex. Penal Code, section 2.02(a).

Both the State and the dissenting opinion assert that criminal law treatises and commentators have recognized a number of different variants of both mistake of law and "reasonable reliance" defenses. (State's Brief 37-38, *Jenkins, supra,* at 68–685.)

43

Jenkins does not disagree. There are myriad formulations of both mistake of law and reasonable reliance defenses that have been enacted into law by various state legislatures; and courts all over the country have discussed in a number of opinions the constitutional underpinnings of a reasonable reliance or "entrapment by estoppel" defense. *See, for example, Commonwealth v. Kratsas,* 764 A.2d 20 (Penn. 2001). But the issue before this Court deals solely with the contours of *Texas'* mistake of law defense *as enacted by the legislature.*

The State asserts that ""[l]egislative history confirms that Section 8.03 Mistake of Law does not apply when one is attempting to negate the mental element " and relies on *Thompson v. State,* 236 S.W.3d 787 (Tex. Crim. App. 2007) as ostensible authority for this proposition (State's Brief at 39); however, *Thompson*, dealt with an analysis of section 8.02–*mistake of fact*–and with "transferred intent"–in 6.04(b) of the Penal Code. While it is true the legislature apparently considered various sources, including the Model Penal Code, when it enacted section 8.03, it is *equally* true the legislature crafted a state affirmative defense–which *only* it is entitled to do–that *omitted* language from § 2.04(3)(b) of the Model Penal Code's mistake of law formulation –"[a] belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when".... "he acts

in reasonable reliance upon an official statement of the law, *afterward determined to be invalid or erroneous....*" (Emphasis added).

As the majority opinion reasoned,

> [*t*]*he operative language of section 8.03(b) is that the actor 'reasonably believes' the charged conduct is not a crime and acts in 'reasonable reliance' on official statements or interpretations of the law—mental states that necessarily negate a culpable mental state that is in some way based on knowledge of the law and legal concepts. See id.* Consequently, we conclude that the plain language of Penal Code section 8.03 demonstrates the legislature intended the mistake of law defense to apply when a charged offense includes, as an element of the crime, a culpable mental state that incorporates knowledge of the law or legal concepts and the accused has presented some evidence that he reasonably believed his conduct did not constitute a crime because he acted in reasonable reliance on official statements or interpretations of the law as specified in the statute. *See Giesberg,* 984 S.W.2d at 248 (recognizing that the Penal Code includes not only justification defenses, but also 'defensive theories which do not involve admission of complicity in the commission of the alleged crime, but which nonetheless attempt to explain why a defendant is not criminally culpable.

(*Id.* at 674-675.)(Emphasis added).

The State's positions advanced herein and below that "[s]ection 8.03 Mistake of Law on its face requires the defendant to admit to having engaged in the 'conduct charged' under the mistaken belief that his conduct was not criminal" and that "[t]o be entitled to the defensive instruction, then, Appellee would have had to have acknowledged that he believed *voting in an election* **in which he knew he did not**

45

***reside*** *was not a crime,* and he formed that belief in reliance on authorities that could sanction that conduct" (State's Brief at 42 and 46), were roundly debunked and rejected by the majority opinion:

> Applying the mistake of law defense in this case demonstrates the flaw in the State's position, because a jury could not conclude that Jenkins 'knew he did not reside in the precinct in which he voted' and also conclude, based on mistake of law, that Jenkins 'reasonably believed' that he did not commit a crime by voting in the election based on his 'reasonable reliance' on the election law authorities. Because a jury could not find both to be true, the mistake of law defense as applied on these facts does not operate as a 'confession and avoidance' or 'justification' type defense, because it does not merely provide a legal excuse for otherwise criminal conduct.[38]

(*Id.* at 676).

**(E)    Whether a defendant had a "reasonable" belief or acted "reasonably" is a fact question for the jury to resolve**

The prosecution argued below that "there is no evidence Jenkins reasonably believed his conduct was lawful or that he reasonably relied on the election law authorities" (*Id.* at 677-678) and argues now that Jenkins' reliance on the official authorities were "unreasonable as a matter of law." (State's Brief at 50). It also relies

---

[38]The dissenting opinion agreed with this aspect of the majority opinion, as well (*Id.* at 685-686), but was of the view that "the kind of mistake of law that Texas has recognized by statute is a defense of confession and avoidance." (*Id.* at 686.) No citation of authority was provided in support of this assertion. Justice Busby's later reliance on federal cases addressing the wholly distinct issue of whether a "good faith" instruction is required in fraud prosecutions where the trial court adequately instructs the jury as to "specific intent" is inapposite. (*Id.* at 686-687). Mistake of law was not at issue in any of those cases; moreover, there is no such codified defense recognized under federal law.

46

on *Shaw v. State,* 243 S.W.3d 647, 657-658 (Tex. Crim. App. 2007) in contending that the trial court did not abuse its discretion in refusing to charge the jury as to mistake of law. (State's Brief at 24-25.)

What the prosecution is attempting to do, however, is to use *Shaw v. State* improperly in an effort to thwart *jury* review of defensive theories at trial. All *Shaw* stands for is the rather unremarkable proposition that before any accused is entitled to the affirmative submission of a defensive jury charge it must be demonstrated that "there is evidence in the record making a prima facie case for the defense." (*Id.* at 657). But a "prima facie case" is simply that "minimum quantum of evidence necessary to support a rational inference that [an] allegation of fact is true." (*Id.*); quoting *Tompkins v. State,* 774 S.W.2d 195, 201 (Tex. Crim. App. 1981) (op. on reh'g).[39] This ultimately becomes a sufficiency question which is reviewable on appeal as a *question of law*. (*Shaw v. State, supra,* at 658.)

But the conundrum for the State is that the specific constituent elements of the defensive theory at issue herein which it contends were not supported or raised by the

---

[39]Furthermore, in determining whether or not the proof adduced at trial constitutes "any" evidence, or evidence "no matter how slight" or "anything more than a mere scintilla," the testimony or evidence must be viewed "*in a light most favorable to the appellant.*" *Holman v. State*, 730 S.W.2d 881, 882 (Tex. App.–Fort Worth 1987), citing *Dyson v. State*, 672 S.W.2d 460 (Tex. Crim. App. 1984), *supra*, at 463. (Emphasis added). Any doubt as to the propriety of charging the jury as to the defense of instruction must be *resolved in the defendant's favor*. *Crawford v. State*, 629 S.W.2d 165 (Tex. App.–Waco 1982).

"minimum quantum of evidence necessary to support a rational inference that [an] allegation of fact is true" pertain to whether Jenkins: (1) *reasonably* believed the conduct charged did not constitute a crime, and (2) acted in *reasonable* reliance upon the aforementioned legal authorities. The case law is clear that whether a defendant had a "reasonable" belief" or acted "reasonably" is a fact issue *not* for the trial judge but *for the jury*. In *Granger v. State,* 3 S.W.3d 36, 38-39 (Tex. Crim. App. 1999), the issue was framed as follows: "*whether the reasonableness requirement is a preliminary issue for the judge to decide in determining whether each element of the defense was 'raised' by the evidence, or whether it is a fact issue that should be left to the jury.*" (Emphasis added.) This Court determined that

> a holding in accordance with the State's position would tend to undermine the general rule that the jury should be responsible for gauging the credibility and veracity of the defensive evidence....*Trial court judges charged with evaluating the 'reasonableness' of an accused's beliefs, no matter how well intentioned, would inevitably be placed in a position in which they were required to make their own decisions about the weight and believability of the defensive evidence.* (*Id*). (Emphasis added).

The majority opinion herein held that "[v]iewing the testimony in the light most favorable to Jenkins, as we must, we conclude that the evidence raised a fact issue concerning whether Jenkins' beliefs were reasonable and, accordingly, the issue was one for the jury to decide." *Jenkins, supra,* at 680.

48

## GROUND FOR REVIEW NUMBER TWO RESTATED

**The Court of Appeals erred in finding that Appellee was harmed by the trial court's failure to provide a Section 8.03 Mistake of Law instruction.**

## ARGUMENT AND AUTHORITIES

The failure of the trial court to include the specially requested instruction cannot be deemed harmless under the circumstances. In the seminal case of *Almanza v. State*, 686 S.W2d. 157, 171 (Tex. Crim. App. 1985), the Court held that art. 36.19 of the Code of Criminal Procedure prescribed the manner in which jury charge error is reviewed on appeal. Initially, an appellate court must determine whether error exists in the jury charge. If so, a determination must be made as to whether sufficient harm was caused to warrant reversal. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). The degree of harm necessary for reversal depends upon whether the error was preserved. *(Ibid.)* Error properly preserved by an objection to the charge will require reversal "as long as the error is not harmless." *Almanza*, 686 S.W.2d at 171. That is to say, *any* harm, regardless of degree, is sufficient to require reversal. *Arline*, 721 S.W.2d at 351; and *Abdnor v. State*, 871 S.W.2d 726, 732 (Tex. Crim. App. 1994).

In the case at bar, it cannot be said with a straight face that the complete omission of a mistake of law jury instruction presents *no harm* in light of the fact that

the entirety of the defensive presentation was predicated on this legal proposition.[40]

The majority opinion concluded that

> Jenkins's entire defense was based on his argument that he reasonably believed he was eligible to vote in the May 8, 2010 RUD election based on his reasonable reliance on the election law authorities, and he presented evidence supporting his defensive theory. Jenkins also timely requested an instruction on the statutory defense of mistake of law. It was for the jury to decide whether Jenkins unreasonably manipulated those authorities to provide cover for illegally voting in the election—which would be a crime; or whether Jenkins changed his residence and voted in the May 8, 2010 election based on a reasonable, but mistaken, reliance on the election law authorities—which would not be a crime. Jenkins' defense was not merely that he denied voting illegally, or that he acted in good faith, or that he was ignorant of the law. This is a situation in which the defensive theory has no context in the absence of the imprimatur of the court, contained in its charge, that a mistaken interpretation of law—when interpretation of law is an element of the offense and is disputed—might support a finding of not guilty. (*Id.* at 681-682.)

---

[40]"An improper jury charge undercuts counsel's ability to argue *effectively* about the law of the case. Of course, Arroyo *can* argue what is not expressly in the charge. *See State v. Renteria*, 977 S.W.2d 606, 608 (Tex. Crim. App. 1998). But, the argument is without the authority of the court having pronounced what is the law. Lawyers can argue many things; they are advocates. They may, or may not, be accurate in what they say and they may or may not be believed. The trial court in this case instructed the jury that 'the law of the case *you will receive from the Court*, which is given you herein, and [for you to] be governed thereby.' The jury *was not obligated to accept* any of Arroyo's statements or argument that could otherwise be construed to 'make up' for, or 'cure', the improperly omitted jury instruction. They were, however, obligated to accept the court's instructions. That's a big difference."

The identical admonition that "...[t]he law of the case *you will receive from the Court*" was included in the jury instructions herein, as well. (CR – 314). (Emphasis added).

*Arroyo v. State*, 9 S.W.3d 330, 336 (Tex. App. 1999) *vacated*, 32 S.W.3d 868 (Tex. Crim. App. 2000).

50

For this very reason, it is respectfully submitted that Justice Busby's assertion that the failure to include a mistake of law instruction in the jury charge was harmless because the prosecution bore the burden of proving beyond a reasonable doubt all constituent elements of the offense including that Jenkins voted in the election knowing he was not eligible to do so misses the mark. (*Id.* at 691.) The jury received utterly no instruction from the trial court that notwithstanding a finding beyond a reasonable doubt that each element had been proved, if it found by a preponderance of the evidence that he reasonably believed the conduct charged did not constitute a crime and acted in reasonable reliance on the aforementioned authorities, he was entitled to an *acquittal*. *See* 8 Tex. Prac. Criminal Forms and Trial Manual § 105.4 (11th ed.) In fact, the antithesis is true: the trial court provided an oral *limiting instruction* to the jury at the time the exhibits were admitted that "you are certainly going to be entitled to review, *if you wish,* Defendant's 1 and 2. But they speak for themselves. And you will– *you may* refer to them in your deliberations...." (RR 9 – 35) (Emphasis added).

The contention by Justice Busby and, now, the prosecution on appeal that the "reasonable belief" and "reasonable reliance" components could, somehow, be relegated to mere jury argument by defense counsel when the Texas legislature has specifically provided a mistake of law defense in the Penal Code which *mandates*

51

submission when raised by the evidence is difficult to fathom. How was the jury to divine without a specific § 8.03 instruction that a reasonable reliance and belief by Jenkins on the legal authorities admitted into evidence was *not* something it was merely permitted to consider "*if you wish*", but rather, under the law, if established by a preponderance of the evidence, literally required the jury to acquit him?

Based on the testimony and documentary evidence presented at trial, the jury charge that was actually given, and the argument of counsel, *some* harm has been demonstrated requiring reversal of the conviction. *Almanza*, *supra*, at 171.

Reversible error is presented.

## **PRAYER FOR RELIEF**

For the foregoing reasons, it is respectfully requested that this Court affirm the judgment of the Court of Appeals reversing the instant conviction and remand the case to the Court of Appeals to address Jenkins' constitutional challenge presented in Point of Error Number Two.[41]

---

[41]*See Reyes v. State,___S.W.3d___, 2015 WL 6726711 (Tex. Crim. App. Nov. 4, 2015); and Davison v. State,* 405 S.W.3d 682, 691 (Tex. Crim. App. 2013).

Respectfully submitted,


*/s/ George McCall Secrest, Jr.*
**GEORGE McCALL SECREST, JR.**
State Bar No. 17973900
BENNETT & SECREST, PLLC
808 Travis Street, 24th Floor
Houston, Texas   77002
(713) 757-0679
(713) 650-1602 (FAX)
gmsecrest@aol.com

Attorney for Appellee,
**JAMES ALAN JENKINS**


## CERTIFICATE OF COMPLIANCE


I hereby certify that Appellant's computer-generated Reply Brief contains 14,958 words (relying on the word count of the computer program) and is in compliance with Rule 9.4(i)(2)(B) of the Texas Rules of Appellate Procedure.


*/s/ George McCall Secrest, Jr.*
**GEORGE McCALL SECREST, JR.**

**CERTIFICATE OF SERVICE**

On the 17ᵗʰ day of December, 2015,a true and correct copy of the Appellee's

Brief in Response State's Brief  was sent to:


Mr. Jon R. Meador
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711


Hon. Lisa C. McMinn
State Prosecuting Attorney
P. O. Box 13046, Capitol Station
Austin, Texas 78711

*/s/ GeorgeM. Secrest, Jr.*
**GEORGE McCALL SECREST, JR.**

# APPENDIX
# "A"



# MONTGOMERY COUNTY ELECTIONS

**P. O. Box 2646**
**Conroe, Texas 77305-2646**

Carol Gaultney, *CERA*
*Elections Administrator*

*www.MontgomeryVotes.org*
*election@mctx.org*

**(936) 539-7843**
**Fax (936) 538-8143**

April 19, 2010

## CERTIFICATION OF VOTER REGISTRAR

STATE OF TEXAS
COUNTY OF MONTGOMERY

Pursuant to the statewide voter registration list requirements set forth in the Help America Vote Act of 2002, 42 U.S.C. § 15483 and Sections 13.072(a) and 18.061 of the Texas Election Code, I, Carol Gaultney, Voter Registrar for the County of Montgomery, State of Texas, hereby certify that this list of registered voters is comprised of the Official State List of Registered Voters maintained by the Office of the Secretary of State pursuant to Sections 13.072(a) and 18.061 of the Texas Election Code for the election held on the 8th day of May, 2010 in the County of Montgomery.

This list represents a best effort to accurately identify all eligible voters within the boundaries of The Woodlands Road Utility District #1. All readily available sources were used, including Montgomery County Appraisal tax rolls, digital Appraisal District boundary files, and a digital file of geocoded registered voters. This list has not gone through a complete street comparison approval process.

Voters on suspense are denoted with an 'S' at the beginning of their certificate number. Suspense voters and all voters who have moved will need to fill out a statement of residence card. Their new address will need to be verified that it is within your current boundaries.

Carol Gaultney, CERA
Elections Administrator/Voter Registrar
County of Montgomery
State of Texas

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY AS TAKEN FROM OFFICIAL COUNTY RECORDS, AS OF 10/29/2013

SUZIE HARVEY
ELECTIONS ADMINISTRATOR

BY _____
MATTHEW MURRAY
GIS DATABASE ADMINISTRATOR

TWRUD1 (24)

## The Woodlands Road Utility District #1 (24)

| Certificate# | EffectiveDate | VUID/Registration | LastName | FirstName | MiddleName | MailAddress | MailCity | MailState | MailZip | ResidenceAddress | ResCity | ResState | ResZip | Sex | Pct | DOB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 017225 | 03/01/1976 | 112685769 | DOYLE | SYBIL | LEA | 18728 BENDING OAKS | CONROE | TX | 77385 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77385 | F | 33 | 11/18/1949 |
| 045542 | 03/01/1982 | 112701572 | GOEDDERTZ | PETER | JOSEPH | 15910 HARTMAN RD | MAGNOLIA | TX | 77355 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77355 | M | 33 | 07/31/1947 |
| 177390 | 06/17/1992 | 112601743 | HEATH | ADRIAN | DAVID | PO BOX 131671 | THE WOODLANDS | TX | 77393 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77393 | M | 33 | 09/24/1957 |
| 177414 | 06/14/1992 | 112601747 | JENKINS | JAMES | ALAN | 16 PASTORAL POND CIR | THE WOODLANDS | TX | 77380 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77380 | M | 33 | 11/09/1950 |
| 185016 | 02/14/1993 | 112778244 | POWELL | SHELLEY | KATHLEEN | 4775 W PANTHER CREEK #130-A | THE WOODLANDS | TX | 77381 | 4775 W PANTHER CREEK #130-A | THE WOODLANDS | TX | 77381 | F | 48 | 10/14/1972 |
| 207351 | 03/13/1994 | 112780545 | COOK | ROBERTA | MARGARET | 607 SYCAMORE DR | CONROE | TX | 77302 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77302 | F | 33 | 03/05/1976 |
| 289639 | 10/05/1997 | 112736786 | MCDUFFEE | RICHARD | CRAWFORD | 27807 HANSONS CT | SPRING | TX | 77388 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77388 | M | 33 | 03/12/1949 |
| 289346 | 11/28/1898 | 112786888 | MOEYKENS | BRUCE | ROY | 9182 SIX PINES DR | THE WOODLANDS | TX | 77380 | 9182 SIX PINES DR | THE WOODLANDS | TX | 77380 | M | 33 | 11/23/1957 |
| 372354 | 04/27/2003 | 112819029 | CURRY | THOMAS | | PO BOX 9738 | THE WOODLANDS | TX | 77387 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77387 | M | 33 | 03/13/1981 |
| 395876 | 09/01/2004 | 112648070 | POWELL | MICHAEL | DEAN | 4775 W PANTHER CREEK #130-A | THE WOODLANDS | TX | 77381 | 4775 W PANTHER CREEK #130-A | THE WOODLANDS | TX | 77381 | M | 48 | 11/08/1982 |
| 397002 | 09/15/2004 | 112662094 | LAUKIEN | DIRK | DANIEL | 2630 N CRESCENT RIDGE DR | THE WOODLANDS | TX | 77381 | 2630 N CRESCENT RIDGE DR | THE WOODLANDS | TX | 77381 | M | 62 | 07/10/1964 |
| 397003 | 09/15/2004 | 112662097 | LAUKIEN | KATIE | MARIA | 2630 N CRESCENT RIDGE DR | THE WOODLANDS | TX | 77381 | 2630 N CRESCENT RIDGE DR | THE WOODLANDS | TX | 77381 | F | 62 | 12/05/1971 |
| 424096 | 10/08/2005 | 112658378 | WOODARD | MARY | MARLENE | 28227 NANCY LN | CONROE | TX | 77385 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77385 | F | 33 | 03/14/1954 |
| 424336 | 10/15/2005 | 112650060 | ALLISON | BENJAMIN | MURRAY | 14993 BOYD LN | CONROE | TX | 77306 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77306 | M | 33 | 04/18/1987 |
| 448563 | 11/17/2006 | 112700360 | RUDNEY | JONATHAN | BRUCE | 10210 GROGANS MILL RD 3RD FL | THE WOODLANDS | TX | 77380 | 10210 GROGANS MILL RD | THE WOODLANDS | TX | 77380 | M | 33 | 06/20/1949 |
| 457882 | 09/08/2007 | 114657882 | PONDER | JAMES | OLIVER | 9333 SIX PINES DR #330 | THE WOODLANDS | TX | 77380 | 9333 SIX PINES DR #330 | THE WOODLANDS | TX | 77380 | M | 33 | 08/12/1954 |
| 476637 | 07/10/2008 | 115474587 | BEARDEN | DEBORAH | ANN | 2203 TIMBERLOCH PL #135 | THE WOODLANDS | TX | 77380 | 2203 TIMBERLOCH PL #135 | THE WOODLANDS | TX | 77380 | F | 33 | 08/26/1961 |
| 486641 | 10/20/2008 | 115204424 | WOODS | JEAN | T | 1040 LAKE FRONT CIR | THE WOODLANDS | TX | 77380 | 1040 LAKE FRONT CIR | THE WOODLANDS | TX | 77380 | F | 33 | 09/08/1927 |
| 510117 | 01/20/2010 | 118857205 | ALLISON | ROBERT | DABNEY | 14993 BOYD LN | CONROE | TX | 77306 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77306 | M | 33 | 01/28/1992 |
| 512966 | 03/27/2010 | 116983311 | MURRAY | KAYLENE | DICKSON | 661 S 2220 W UNIT 103 | PLEASANT GROVE | UT | 84062 | 10001 SIX PINES DR | THE WOODLANDS | TX | 84062 | F | 33 | 11/07/1958 |
| 513958 | 03/27/2010 | 117002007 | MURRAY | STEVE | KENT | 661 S 2220 WEST UNIT 103 | PLEASANT GROVE | UT | 84062 | 10001 SIX PINES DR | THE WOODLANDS | TX | 84062 | M | 33 | 08/23/1956 |
| 514112 | 05/07/2010 | 117049991 | BERNTSEN | BILL | | 32 N RAINFOREST CT | THE WOODLANDS | TX | 77380 | 9333 SIX PINES DR | THE WOODLANDS | TX | 77380 | M | 33 | 03/16/1951 |
| S450791 | 03/10/2007 | 109835909 | VALLEY | REAGAN | JONES | 1600 LAKE FRONT CIR | THE WOODLANDS | TX | 77380 | 1600 LAKE FRONT CIR | THE WOODLANDS | TX | 77380 | | 33 | 10/08/1974 |
| S478254 | 07/03/2008 | 115459824 | HARFIELD | RAYNELL | CHARLENE | 1600 LAKE FRONT CIR #100 | THE WOODLANDS | TX | 77380 | 1600 LAKE FRONT CIR #100 | THE WOODLANDS | TX | 77380 | F | 33 | 11/05/1963 |

Page 1

I CERTIFY THAT THIS IS A TRUE AND CORRECT COPY AS TAKEN FROM OFFICIAL COUNTY RECORDS, AS OF 10/29/2013

SUZIE HARVEY
ELECTIONS ADMINISTRATOR

BY

MATTHEW MURRAY
GIS, DATABASE ADMINISTRATOR

